[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 ARTICLE I THE DISSOLUTION OF THE MARRIAGE
It is found that all of the allegations of plaintiff's complaint have been proven and that the marriage has broken down irretrievably. The marriage of the parties is therefore dissolved.
 ARTICLE II FINDINGS CONCERNING PREMARITAL PROPERTY
The defendant at the time of her marriage to the plaintiff on December 31, 1991 was the owner of a condominium located at 13 Uplands Way, Glastonbury, Connecticut which he had purchased several years previously. On October 23, 1994 following the entreaties of plaintiff, and their psychologist, defendant conveyed a one half interest in this property in survivorship form to plaintiff. This court believes that any increase in the value of the condominium subsequent to the marriage of the parties and any decrease in the amount of encumbrances on the property thereafter should be considered part of the marital estate when dividing the marital assets of the parties. See Jackson v. Jackson,17 Conn. App. 431 (1989). To that end the following findings are made:
A. THE VALUE OF THE CONDOMINIUM ON DECEMBER 31, 1991
Defendant testified that on the date of his marriage to plaintiff his condominium had a value between $140,000 and $160,000. Plaintiff also introduced into evidence a letter defendant had written to his former wife on February 6, 1992, little more than a month after the marriage, wherein he stated that similar new units were selling for $160,000 and that some people had lowered their sale price to $140,000 for similar units. CT Page 13815
This court determines the value of the condominium at the time of the marriage of the parties to be $157,500. It is further found that the balance of the first mortgage on that property on that date was $117,152, that the home equity loan balance then was $9,478, and that the total equity to the condominium at that time was $30,270.
B. THE PRESENT VALUE OF THE CONDOMINIUM
It is further found that the present value of the condominium is $198,500 (stipulation), that the encumbrances on the property total $107,375 and that the present equity in the property is $91,125.
It is determined that the present value of that portion of the condominium to be considered when distributing the marital estate is $60,855.
C. OTHER FINDINGS
1. That portion of defendant's 401k account balance which he had acquired prior to his marriage to plaintiff ($4,621) is also not considered part of the distributable marital estate.
2. It is also noted that when the parties married plaintiff had a 1987 Volkswagen while defendant owned a car and various appliances. None of this property is considered part of the marital estate.
 ARTICLE III. THE MARITAL ESTATE OF THE PARTIES
Plaintiff
 Total equity in 13 Uplands Way, Glastonbury, CT (Marital share only) $60, 855
One half interest $30,428 30,428
1992 Nissan Maxima
 Total Value $2,400 1/2 interest $1,200 1,200
1996 Ford Explorer
Total Value $10,750 CT Page 13816 1/2 interest 5,375 5,375
 Household furniture, etc. — Hudson Valley F.C.U. (C/A; S/A) 28 I.B.M. Stock (50 shares at $72.12 P/S) 3,606
______
SUBTOTAL $40,637
Defendant
 1/2 interest in marital equity in 13 Uplands Way, Glastonbury, CT 30,427
1/2 interest in Nissan Maxima 1,200
1/2 interest in Ford Explorer 5,375
Household furniture, etc. —
Hudson Valley F.C.U. (C/A S/A) 100
Pax Money Market 1,000
Galaxy Money Market 5
I.B.M. T.D.S.P. (marital portion only) 49,858
I.B.M. Pension —
Airline Tickets (4)
 I.B.M. Stock 94 shares 6,750 ______ SUBTOTAL $94,715
TOTAL MARITAL ESTATE $135,352
 ARTICLE IV AN EXAMINATION OF THE EVIDENCE AS IT RELATES TO SEC. 46b-81c C.G.S. A. GENERAL BACKGROUND INFORMATION
CT Page 13817
The plaintiff wife, who is thirty-five years of age, and the defendant husband, who is forty-four, were married on December 31, 1991, ten years ago. This was plaintiff's first marriage and defendant's second. They have one child, Michael, who is three years old.
Prior to meeting defendant in February 1989 plaintiff had graduated from Trinity College where she received department honors in her psychology major. In September, 1989 she moved in to defendant's condominium where she continued to pay defendant $300 monthly rent until their marriage two years later. At this point in their lives plaintiff made defendant aware of her plans to attend graduate school and to continue her studies in psychology. She attended the University of Connecticut intermittently finally receiving her M.A. degree in 1996 and her Ph.D. degree in psychology in 1999.
At the present time plaintiff is employed part time as a psychology resident in Glastonbury earning $365 gross weekly, with a weekly net after the usual deductions of $310. Her future plans include a continued interest in psychology either as a private practitioner or in an academic setting.
Defendant graduated from Cornell University in 1981 where he received a B.S. degree in business subjects. Shortly thereafter he commenced his employment with I.B.M. where he has continued to work since that time. His present weekly income from salary and commissions is $1,648 with a weekly net after the usual deductions is $1,109.
B. FAULT
 Plaintiff
Plaintiff stated that defendant "would get very angry if I told him I was out of money." He would say "get a job." He would swear at me monthly during my pregnancy. He pushed me twice during 1999. I filed for divorce because he refused to give me any money and wouldn't continue mediation.
Much of plaintiff's complaints related to family finances. On that subject she stated that defendant "stated strongly and frequently how I should spend the money. I was deprived of things after my son was born." Defendant's use profanity increased as the marriage lengthened and in her view contributed to the breakdown of the marriage.
Defendant
Defendant's view on responsibility for the breakdown of the marriage is CT Page 13818 summarized in the following quotes from his testimony: "We may never have been a very good match. We were in counseling when we married. We had a problem of control. We were two leaders, two type "A' personalities. I allowed her an above average lifestyle. She was a great wife and mother, but we fought a lot about money. She had a free ride during the marriage. She was not a financial asset.
Observations of the Court
In accepting some responsibility for the breakdown of their marriage, the statements of the parties are interesting:
Plaintiff: "I changed the rules. I stopped being accommodating. I was `picky' about Michael."
Defendant: "I was an excellent financial provider but was emotionally detached."
The court surmises that a husband's reminder to a wife that he is an excellent provider is not a recipe for a happy marriage.
On all of the evidence it is concluded that fault for the breakdown of the marriage rests primarily with defendant.
C. HEALTH Plaintiff describes her health now as "mostly good — anemic — some fatigue."
Defendant states that his health is excellent. He has had three concussions in the past but "has no problem with this."
Of more than passing interest on this subject is the fact that throughout their ten year marriage together the parties were in therapy. In plaintiff's words "I encouraged it, even at times insisted on it. I found that by going to therapy we could get back on track. It may have been hard for (defendant) to keep up the counseling at that level." Plaintiff instituted the present action one month after defendant refused further therapy. Defendant testified he finally ended the counseling "because I saw the handwriting on the wall. She requested it always — to keep us married."
D. OTHER FACTORS
1. Liabilities
Plaintiff lists on her financial affidavit a student loan debt in the CT Page 13819 amount of $48,108. A portion of this amount ($7,500) had accrued prior to her marriage with the remainder having been incurred while obtaining her M.A. and Ph.D. degrees at the University of Connecticut.
On the issue of the extent of defendant's responsibility for these debts, plaintiff's proposed orders request that he contribute $20,574 toward the outstanding balance. The court notes on plaintiff's testimony on this issue are somewhat different i.e. "I don't claim defendant is responsible for these loans."
Inasmuch as plaintiff obtained her last degree (Ph.D.) only two years before bringing this action and still awaits the full benefits from her cerebral efforts, it is difficult to conclude that defendant should share the cost of her education but not in the fruits of her labors.
2. Other Factors
The parties appear to be equal in their vocational skills, plaintiff in the area of psychology and defendant in the field of sales of hi-tech equipment. Their opportunities for the future acquisition of capital assets and income also appear similar. The parties have made equal contributions to the marital estate, each in his or her own way.
Conclusion
Having considered all of the factors set forth in Conn. Gen. Stat. § 46b-81c and having given particular weight to a predominating factor i.e. the causes for the dissolution of the marriage, it is concluded that the marital estate should be divided as follows:
Plaintiff 55%
Defendant 45%
 ARTICLE V THE DIVISION OF THE MARITAL ESTATE IN ACCORDANCE WITH THE FINDINGS MADE IN ARTICLE IV (supra)
Total Marital Estate $135,352
Plaintiff's Share (55%) 74,444
Defendant's Share (45%) 60,908
Plaintiff Shall Take and Have
CT Page 13820
1/2 defendant's I.B.M. (J.D.S.P.) $24,929
 Household furniture, jewelry, etc. — (all as per her financial affidavit)
Hudson Valley F.C.U. 28
I.B.M. Stock — 50 shares 3,606
1/2 Marital portion of defendant's pension —
Two airline tickets —
 Amount due from defendant 45,881 ________ $74,444
 Defendant Shall Take and Have
 Whole equity in 13 Uplands Way, Glastonbury, CT $60,855
1992 Nissan Maxima 2,400
1996 Ford Explorer 10,750
Household furniture, etc.
Hudson Valley F.C.U. 100
Pax Money Market 1,000
Galaxy Money Market 5
1/2 I.B.M. T.D.S.P. (marital portion only) 24, 929
 I.B.M. Stock (94 shares) 6,750 $106,789 Less amount due plaintiff — 45, 881 ________ Amount due defendant $ 60,908
 ARTICLE VI
CT Page 13821 SUPPLEMENTAL ORDERS RELATING TO THE DISTRIBUTION OF THE MARITAL ESTATE
A. Plaintiff will, on or before forty-five days from date hereof, convey to defendant by quit claim deed all her right, title and interest in premises known as No. 13 Uplands Way, Glastonbury, Connecticut.
Simultaneously, defendant will pay to plaintiff the sum of $45,881.
B. Defendant will transfer to plaintiff by Q.D.R.O. one half of that portion of his I.B.M. pension that accrued during the course of his marriage to plaintiff. Defendant will also smilarly transfer to plaintiff one half the marital portion of his I.B.M. (T.D.S.P.) i.e. $24,929.
C. Each party will execute all documents necessary to carry out the orders of this court.
D. Defendant will hold the plaintiff harmless concerning any encumbrances now on said property.
 ARTICLE VII ORDERS CONCERNING THE MINOR CHILD
A. The stipulation of the parties dated June 28, 2002, signed by all parties and attached hereto is approved and made a part of this judgment.
Further, defendant shall have one weekend to include two overnights alone with the minor child in addition to the regular schedule.
Defendant's girlfriend (or any future boyfriend of plaintiff) shall be gradually introduced to the minor child as recommended by Tom Fulop, the child's guardian ad litem.
B. Defendant shall pay plaintiff as child support the sum of $203 weekly. An immediate wage withholding order may issue.
C. Plaintiff shall pay 33 percent and defendant 67 percent of the minor child's weekly daycare expense, and expenses incurred in visits to Tom Fulop.
D. Defendant shall maintain medical insurance for the benefit of the minor child as the same is available at his place of employment. Plaintiff shall be responsible for 33 percent of his unreimbursed health CT Page 13822 expenses and defendant for 67 percent thereof.
E. The parties shall annually alternate the minor child as a dependant for federal and state income taxes, beginning with the plaintiff for the tax year 2002.
 ARTICLE VIII ALIMONY
Having considered all of the factors set forth in Conn. Gen. Stat. § 46b-82, in particular the length of the marriage (10 years), the employment skills of the parties, and the desirability of the plaintiff mother securing employment, it is ordered that defendant pay to the plaintiff as alimony the sum of $300 per week for a period of two years and the payment of $150 per week for a period of three additional years.
Said orders of alimony are non-modifiable as to term only but shall sooner terminate upon the remarriage of the plaintiff or the death of either party. In the event of plaintiff's cohabitation with an unrelated male, the provisions of Conn. Gen. Stat. § 46b-86 (b) shall govern.
 ARTICLE IX OTHER ORDERS
A. Counsel Fees
The court's notes on this issue indicate that defendant testified he had thus far paid his attorney $8,500 and owed him another $4,000. Plaintiff's counsel in final argument stated he had received less than $1,000 in legal fees from his client; this is confirmed in his bill submitted as an exhibit.
So that the parties are on a level playing field on this issue it is directed that the sum of $3,750 be paid by defendant to plaintiff as counsel fees.
B. Life Insurance
The defendant shall continue to maintain his present life insurance policy with I.B.M. having a face value of $150,000 and with plaintiff and the minor child Michael as irrevocable beneficiaries during such time as he shall be required to pay either alimony or child support. CT Page 13823
C. Frequent Flyer Miles
Plaintiff shall receive one half of the existing frequent flyer/travel miles.
D. Liabilities
Each of the parties shall be solely responsible for all debts listed on his or her financial affidavit and shall hold the other party harmless in that regard.
BY THE COURT
John D. Brennan, Judge Trial Referee
FA01 0726898S : SUPERIOR COURT
EVE M. PERUGINI : J.D. OF HARTFORD
VS. : AT HARTFORD
GREGORY N. ALLEN : JUNE 28, 2002
 STIPULATION
The Plaintiff and Defendant hereby stipulate and agree as follows:
1. CUSTODY. Legal custody of the minor child, Michael Allen, born June 4, 1 999, shall be joint.
The Mother's residence shall be the primary residence of the minor child.
The parties shall exert every reasonable effort to maintain free access and to foster feelings of love and respect between the child and the other parent. Neither parent shall do anything which may estrange the child from the other parent nor injure the child's opinion of his Mother or Father nor act in such a way as to hamper the free and natural development of the child's love and respect for the other party. Neither party shall speak disparagingly about the other in the presence of the child.
Both parents shall consult with each other on all non-emergency matters affecting the health, safety, welfare, religion and education of the child, before such action involving the children is taken. These matters shall include, but not be limited to, such substantial issues as CT Page 13824 educational programs, religious upbringing, daycare, camp, extracurricular activities and medical treatment.
In the event that a conflict exists as to such major decisions which is unresolvable through mutual discussion, the parties shall first attempt to reconcile their differences through discussion with Tom Fulop, who shall be appointed the Guardian Ad Litem for Michael. If an agreement cannot be reached after consultation with Tom Fulop, the Mother shall have ultimate decision making authority on the disputed issue, which authority shall not be unreasonably exercised. The Father shall have the right to challenge that decision, if he chooses to do so, by bringing a motion before the court and either party may call Tom Fulop as a witness to testify in his capacity as Guardian Ad The Mother retains the right to also file motions with the court when circumstances warrant such action be taken.
Each of the parties agrees to keep the other reasonably informed of the whereabouts of the child while he is with the Father or Mother, and agrees that if either has knowledge of any illness or injury or other circumstances seriously affecting the health or welfare of the child, the Father or Mother, as the case may be, will promptly notify the other. If either party is with the child out of state, he or she will provide the other a written itimerary, including dates and times for travel, addresses and local telephone numbers.
Neither parent shall coerce, threaten, harass, intimidate, discourage or in any way deny the child reasonable access to the other parent. Access shall include, but not be limited to the child telephoning, writing or e-mailing either parent or receiving telephone calls, letters or e-mails from either parent. Access to the child by regular or e-mail and telephone shall be during reasonable hours of the day and evening.
Each party shall be entitled to complete, detailed information from any physician, teacher, guidance pediatrician, dentist, therapist, consultant, counselor, or specialist attending the child for any reason whatsoever and to be Furnished with copies of any reports given by any of the aforementioned to the other parent.
Each party shall promptly notify the other of any school, athletic, medical, extracurricular or other event involving the child. It is the intent of the Father and Mother that such notice will facilitate the attendance by both parents at any such event involving the child, no matter who the child may be residing with at that time. Each parent shall schedule any celebration of the event only during the time the child is with him or her, absent mutual agreement otherwise. Furthermore, both CT Page 13825 parents, absent an emergency, extraordinary circumstances or mutual agreement, which shall not be unreasonably withheld, shall not schedule the child for conferences, events or activities during the time he is with the other parent.
 2. PARENTING SCHEDULE. Father will have parenting time with the minor child as follows:
Tuesdays: 5:00 p.m. — 7:00 p.m.
Wednesdays: 5:00 p.m. — 7:00 p.m.
Alternating weekends from Saturday, noon until Sunday, 9:00 a.m.
The child will be in Mother's care at all other times.
THERE SHALL BE NO DEVIATION FROM THIS SCHEDULE ABSENT MUTUAL WRITTEN OR E-MAIL AGREEMENT. ANY CHANGE MUST BE REQUESTED AT LEAST FORTY-EIGHT (48's HOURS ADVANCE BE RESULT EMERGENCY OR UNFORESEEN CIRCUMSTANCES. THE MINOR CHILD'S DAYCARE ROUTINE AND ATTENDANCE SHALL NOT BE INTERRUPTED ABSENT EMERGENCY OR EXIGENT CIRCUMSTANCES.
Any pickup or drop off for parenting access shall occur in the parking lot of Chuck's Country Store, Glastonbury, CT. The Father shall not climb into the Wife's car or enter her residence for any reason whatsoever.
In addition to regular weekly access, the parties agree to alternate major and school holidays.
Mother's Day shall be with Mother and Father's Day shall be with Father no matter who the child is scheduled to be with that weekend.
Except as otherwise provided for herein, access for holidays and special occasions shall supercede regular and vacation access.
The parties agree to meet with Tom Fulop for as often as he deems necessary but no less than once quarterly during the first post judgment year to discuss the parenting schedule, including but not limited to, future summer access, school vacations, holidays and introduction of Michael to relationships which may in the future develop between the Mother or Father and third parties.
 ___________________ ___________________ Eve Marie Perugini Gregory Allen Plaintiff/Mother Defendant/Father
CT Page 13826
 ___________________ ___________________ Attorney Jefffery D. Mickleson Attorney Ronald Scott Attorney for the Plaintiff Attorney for the Defendant
 ___________________ Tom Fulom Guardian Ad Litem
CT Page 13827